## THE JOHN D. DAILEY.

(District Court, E. D. New York. December 3, 1907.)

TOWAGE—INJURY TO TOW—LIABILITY OF TUG.

> A tug took two mud scows from Atlantic Basin to the dumping grounds off Sandy Hook on a winter night. The weather was cold, with a strong northwest wind causing a considerable sea. On reaching the grounds the tug gave the signal for dumping the scows, and received a return signal from the rear one that she was dumped, but not receiving such signal from the forward one which was on a hawser, 1,200 feet long she circled around two or three times to aid in freeing the scow of her load, and then started back. The forward scow had not in fact been dumped except as to the rear pocket, and when it became daylight, before reaching the city, it was found that she had capsized; the proximate cause as appeared from the evidence being the action of the scowman in improperly beginning by dumping the rear pocket which put her down by the head. Held, that the tug was not chargeable with contributory fault because she failed to sooner ascertain the condition of the scow, it appearing from a preponderance of the evidence that owing to the condition of the weather and sea she could not have assisted in dumping the scow if she had known her condition, and that she was not negligent in returning.

In Admiralty. Suit against tug for injury to tow.

Sutherland D. Smith, for libelant.

Alexander & Ash, for claimant.

CHATFIELD, District Judge. Upon the 8th day of January, 1903, late in the afternoon, the W. H. Beard Dredging Company, which had obtained a permit for its tug, the Kimpland, to tow two dredges filled with mud, from the Atlantic Basin to the dumping grounds, half a mile southeast of the Scotland Lightship, off Sandy Hook, entered into a contract with the firm of Booth, Dailey & Ivins to have these two scows towed by the John D. Dailey. Thereupon, between 5 and 6 o'clock in the afternoon, the Dailey proceeded to take on coal, went to Atlantic Dock, took the two scows in tow, scow No. 6 being next to the tug, and scow No. 8 in the rear, and began the journey to the dumping grounds. Until through the Narrows and well down the bay the scows were kept upon a short hawser, and before passing out into the Lower Bay these hawsers were let out, the method of towing being by means of a bridle and hawser, with an eye in the end of the hawser attached to the bridle. After lengthening the hawsers, a space of some 1,000 or 1,200 feet separated the tug and scow No. 6. A distance of 400 to 500 feet existed between the two scows. At the time the start was made the tide had been running ebb for an hour and a half or two hours, and there was blowing from the northwest, directly down the course which the tow had to take, a strong wind, as shown by the testimony of the witnesses and also by the government reports, varying from 29 to 33 miles an hour. This wind was of such strength that the witnesses all agree

it would cause considerable sea, and would render the towing of an empty scow against the wind more difficult than when loaded. It would cause waves to break over the bow of the scow, down at the head, and more than nullify the effects of the flood tide. All of the witnesses agree that with scows in good condition, and under ordinary circumstances, it was not dangerous to undertake such a trip, and the court can see nothing connected with the expedition which could be found to have been an unusual circumstance, or to have taken the trip out of the ordinary, until the dumping grounds were reached. The thermometer showed a temperature below zero. The night was clear but dark, and the scowman upon No. 8, the rear scow, a witness for the libelant, testifies that, after the tow was turned and was coming up the bay against the wind and spray, the boats became covered with ice. There is testimony that scow No. 6 was not entirely level, and that one corner forward was down, but there is nothing to indicate that this condition had anything to do with what occurred subsequently, or was of such a character as to make it negligence on the part of any one connected with the expedition to start with the scow loaded in that manner.

The evidence shows without contradiction that the Dailey reached the dumping grounds shortly after midnight. She was checked by the government patrol passing out. The testimony shows satisfactorily that she went far enough beyond the lightship before giving any signal or before any dumping occurred. The signal to dump (four blasts of the whistle) was given, and no failure to give this signal properly can be imputed. The occurrences immediately after the signal furnish the real point of dispute in the case, and if there was any negligence on the part of the claimant or its servants in the management of the tug, it must be based upon what occurred after the signal to dump was given. The scowman upon the rear scow testifies that he heard the signal, or knew that it was given, that he succeeded in dumping all the pockets of his scow, each scow being a square-ended, flat-decked boat, having six pockets, fitted with chains and pawls by which the doors in the bottom of each pocket could be released from the deck, and with a coaming around the pockets, and having a small cabin or deckhouse in which the scowman upon each scow could seek protection from the weather and waves. It is testified and not disputed that if the buoyant space in the hold of the vessel, between the pockets and the sides of the vessel itself, becomes filled with water in any way, the scow may turn turtle, and the evidence seems to show that scow No. 6 was ultimately capsized through the effect of the water which in some way entered her watertight space, and rendered her liable to be overturned when veering or plunging from the effect of the wind and waves. The scowman upon scow No. 8 signaled with his lantern upon the completion of the dumping of his scow, but no signal was given at that time by the scowman upon scow No. 6, who was seen just before to have had one of the fixed lights of the scow in his hand, while beginning the process of dumping the scow. The tug, having proceeded a short distance on her course after giving the signal to dump, circled around, and it is contended that she turned against the wind, rather than with

the wind. It was testified by her captain that turning against the wind would shake out the mud from the pocket which stuck, and therefore the turn was made so as to assist the process of dumping as greatly as possible. Inasmuch as the wind was practically behind the tow in its course, it does not seem that any danger could have been avoided by turning to port instead of starboard, and the course pursued by the scowman upon scow No. 6 .interfered with the proper order of events before any action by the tug affected the situation. It is certain from subsequent conditions that the scowman upon scow No. 6 knocked out the pawl, and attempted to dump the rear pocket first, thus throwing his boat down by the head. Whatever his motive may have been, whether he considered it impossible to reach the bow of the boat, or whether he ignorantly dumped the pockets in wrong order, makes no difference. The subsequent occurrences seem to have resulted from his mistake at that time. The captain of the Dailey testifies that he went around in a circle, and then turned once or twice after completing the circle, in order to assist in dislodging the pockets of scow No. 6, from which he had received no signal. The engineer of the Dailey thinks that they went around in a circle three or four times. But this discrepancy affects only the accuracy of their recollection or their credibility. They testify that some signal was seen in the shape of the movement of a white light upon scow No. 6, and that then they headed up the harbor for home.

It appears from the testimony that the lightship or one of the patrol boats threw a search light upon the scows, and ascertained that scow No. 6 had not been dumped, with the exception of the after pocket. The various witnesses agree that at that time the scowman on scow No. 6 could not be seen. The captain and engineer of the Dailey testify that they could not tell, at the time the search light was thrown, whether scow No. 6 had been emptied, or whether she was pitching in the seaway. But, in any event, they continued on their course up the bay, making but little progress against the wind, in spite of the fact that they had a flood tide then in their favor, and it became daylight before they reached Romer Shoal. At that point the patrol boat Lamont intercepted them, and observed that scow No. 6 was capsized. The engineer of the Dailey testifies that shortly before this he noticed his engine turning hard, and the Dailey then turned back and ran around so as to ascertain that scow No. 6 had been capsized, and the captain of the Lamont reports a conversation as to the whereabouts of the scowman upon scow No. 6. The situation having been investigated by the captain of the Dailey, he determined to continue up the harbor, proceeded slowly while the tide was at ebb, and reached the Atlantic Basin late in the afternoon of January 9th, at that time having about three or four tons of coal left in his coal bunkers.

In view of the service performed, and all of the testimony, there seems to be no reason for holding that the Dailey did not have sufficient coal or sufficient power, nor that she was insufficiently manned or out of condition, and the whole case turns upon the management of the Dailey from the time that her officers learned that scow No. 6 had not been promptly dumped, up to the time when a decision had to be made by the captain of the Dailey, after learning that scow No. 6 was cap-

sized, when he was in the neighborhood of Romer Shoal. There is nothing in the case to show that scow No. 6 was out of condition, but on the contrary the evidence would indicate that she was a properly constructed scow, and in good order before the trip. Testimony was offered, under objection, to show that her scowman reported some two inches of water in her hold before starting; but even if the testimony was admissible it would prove nothing showing a dangerous condition of the scow. Assuming what appears to the court to be the fact, namely, that the first act of negligence was on the part of the scowman, and that this act was the proximate cause of the events which followed, it is necessary to consider whether the officers of the tug were also negligent in omitting to do those things, if any there be, which might have interrupted or prevented the series of accidents and injuries subsequent to the time of turning back with the tow for New York.

Testimony was offered to the effect that in good weather men could be put upon a scow in order to accomplish the dumping, if the scowman had failed to attend to his duties; that the tugboat, in fair weather, could have bumped into the scow, in order to jar the doors of the pockets and set free the mud; or, if it proved necessary to tow the scows back to New York undumped, the hawser could have been reversed, and the scow towed stern foremost to avoid the necessity of towing her down by the head. But under the conditions of wind and weather existing that night, the testimony of the experts as to the feasibility of these plans does not appeal to the court, and their qualifications as to accomplishing these operations in rough weather make it extremely improbable that any one of them could have been successfully undertaken on this occasion. Considering the question of negligence, it is not possibility, but the question of a right, reasonable decision which must be the test in determining whether what actually was done was negligent, or whether it was negligence not to do something else. It is not sufficient in this case to determine simply whether the officers and lookout of the Dailey did or did not learn as quickly as they might the true condition of affairs. The question which must be answered is whether, assuming negligence or indifference in this respect, any other course than that pursued should or would have been followed, even if these officers had been alert and successful in finding out what had happened. It is the ordinary question of determining whether contributory negligence, even if it existed, contributed or was a proximate cause of the injuries themselves, which must be answered in this case.

Upon the testimony of the experts, it cannot be said that the captain of the Dailey could have proceeded either to Rockaway or down the coast, or that as a prudent man, using his reasonable faculties, there was any other course open to him than to attempt to return up the harbor. This statement is made from the supposed situation of the captain, with knowledge of the fact that scow No. 6 had not been dumped, and that the scowman was missing, a knowledge which he did not possess, but which, it might be said, he could have obtained if for any reason there was an obligation upon him to do so. The conduct of the captain of the Dailey in waiting for the ebb tide to run, and in bringing the scow to the Atlantic Basin instead of putting her in

Gravesend Bay to be tossed about by the waves, does not seem to be negligence. The condition of the scow and her injuries resulted from the treatment which she received from the waves, and there is no evidence in the case to show anything which the captain of the Dailey could have done to have prevented the results which ensued from the manner in which the scowman undertook to perform his work.

It is necessary to refer to the testimony of the scowman upon scow No. 8, who stated that in his opinion, the decks not being icy and the waves not extremely large, a person could have been put on board of scow No. 6 by the Dailey before the tow was turned back up the harbor. This opinion is contradicted by that of nearly all the other witnesses in the case, and particularly by the witnesses who observed the conditions that night. Some argument has been offered as to the effect of one scow in smoothing the waves in the path of the following scow, but inasmuch as the boats were supposed to be turning in a circle, little inference can be drawn, and the weight of the testimony seems to bear out the idea, that conditions were too rough to charge negligence upon the Dailey because of her failure to make the attempt to ascertain the cause of the trouble, or to put somebody on board to assist in dumping.

The libelant cites the case of The O. L. Hallenbeck (D. C.) 119 Fed. 468, as authority for the proposition that if the officers of the tug were guilty of any act or omission by which they might sooner have learned the true condition of affairs, they were guilty of at least contributory negligence, and that the Dailey should be held therefor. It is impossible, from the printed report in the Hallenbeck Case, to learn how the accident occurred, but the gross negligence of the officers of the tug, in being oblivious to everything, and not even knowing that the tow was gone, so as to try to aid or rescue it, was properly considered evidence that their actions were negligent all of the time, and that the ultimate loss of the scow was their fault.

In the present case, as has been stated, closer attention by the officers of the Dailey might have put them in earlier possession of knowledge of conditions. But there is no such gross negligence nor any such presumption that loss might have been prevented as apparently must have existed in the Hallenbeck Case, in order to form a basis for the decision. The accident did not occur because of any negligence on the part of the Dailey, and her officers apparently owed no duty to do more, and in fact could have done no more, than they did do, in any event.

The libel must be dismissed.